# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

VICTORIA HARRIS,

        Plaintiff,               CASE NO. 05-CV-10294

v.                       DISTRICT JUDGE THOMAS LUDINGTON
                         MAGISTRATE JUDGE CHARLES BINDER

J.B. ROBINSON JEWELERS,

        Defendant.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. 66)

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendant's motion be

**GRANTED** and the case be **DISMISSED** in its entirety with prejudice.

## II.    REPORT

### A.    Background

By order of United States District Judge David M. Lawson, this *pro se* civil case alleging

"breach of trust/duty" and "embezzlement/larceny/conversion/damage to personal property/civil

theft" was referred to this magistrate judge for pretrial case management on November 21, 2005.

(Dkt. 3.)  The case was reassigned to United States District Judge Thomas L. Ludington on

September 12, 2006.  (Dkt. 23.)  On May 9, 2008, Defendant filed the instant motion for summary

judgment.  (Dkt. 66.)  Plaintiff responded (Dkts. 76, 77), and Defendant replied. (Dkt. 78.)  Upon

review of the documents, I conclude that pursuant to E.D. Mich. LR 7.1(e)(2), the motion is ready

for Report and Recommendation without oral argument.

This case was originally filed in the Circuit Court of Saginaw County, Michigan, but was removed to this Court on November 15, 2005, based on diversity of citizenship jurisdiction. 28 U.S.C. §§ 1332, 1441. In her complaint, Plaintiff alleges that she purchased a wedding ring[1] from Defendant on July 8, 1973.[2] (Dkt. 1 at 6.) She explains the details surrounding the purchase:

> I loved the set, and believed it was waiting for us. Even though, it cost much more than the marked down price and the marked down price was high ($476). It was graciously given to us at a price we could afford to pay $395. I privately believed it was a gift from Hatfield Jewelers for my wedding day and life. It was an act of kindness for the pain I secretly carried in my heart. I always knew my wedding day would be less special to me since a child. I had resigned not to have a big church wedding because I had no parents to share that day. The ring had a secret I which loved very much. (Why I called it a secret I don't know. It could be seen by anyone.) I always thought the smaller diamonds and rubies were very, very little. But it was the large center diamond (flawless 2.35 ct) that made the ring outstanding.

(*Id.*)[3] Plaintiff indicates that her ring was a "Carioca" style with a large center "Starfire" diamond in natural pink, surrounded by two white diamonds and three rubies. (Dkt. 1 at 9.)

Defendant agrees that Plaintiff purchased a ring from Defendant but notes that the receipt does not indicate a "pink" center diamond was purchased, nor does the receipt indicate the size or quality of the center stone. (Dkt. 66 at 2, Ex. 4.)

Plaintiff states that she took her ring to Defendant's store to be sized properly, i.e., enlarged, in August of 2002. (Dkt. 1 at 6-7.) Plaintiff was assured her rings would be repaired on site and would not leave the store. (Dkt. 1 at 7.) Plaintiff "felt nothing would happen to [her] set because no outsiders would handle them. On this fact, [she] left both rings because [she] trusted it was

---

[1] Plaintiff's ring is "actually comprised of two rings that were fused together at the base to form a conjoined wedding 'set.'" (Dkt. 66, Ex. 3 ¶ 6.) Thus, Plaintiffs "ring" may also be described as "rings" without any intentional change in meaning.

[2] Actually, Plaintiff purchased the ring from Hatfield Jewelers, a company which was later acquired by Defendant.

[3] The use of "[sic]" to indicate grammatical error is avoided in this Report.

safe. [She] didn't realize that . . . leaving [her] possessions made them available for theft." (*Id.*) When she told her husband, [h]is response had concern, because he had seen a TV program about jewelry switching." (*Id.*)

Although she was promised the ring would be done by August 12, 2002, she received no word from Defendant on that date so she went to Defendant's store on August 13. The "clerk had a problem locating the rings," but eventually found them and gave them to Plaintiff. (*Id.*) Plaintiff describes her reaction to seeing the ring set as follows:

> I look at the gift ring. The ring was not a good round circle. I took it anyway. <u>My wedding set was my super shock! I could hardly believe my eyes! There was glitter and sparkles everywhere. I heard myself saying loudly, 'What is this? What is this? This is not mine ring (diamond) This is not mine!' She said, 'Yes,' I said, 'No, it's not. There's too much glittering and sparkling and it's small. This is not mine. There's a big gap.'</u> From the side view, the diamond looked like a splinter of a diamond. The prongs were almost empty. Carissa mentioned it might have been dirty. She went to the display case and got a ring and said, 'see, it's the same.' <u>And they did look the same. I said, 'That's the problem. They shouldn't be mine is 29 years old.'</u> I was irate to say the least.

(Dkt. 1 at 7 (emphasis in original).) Plaintiff apparently left the ring and later attempted to resolve the problem with Defendant's store manager but to no avail. (Dkt. 1 at 7-8.)

On August 18, 2002, Plaintiff went back to Defendant's store, was again given the ring, and when she "looked at the diamond it didn't glitter and sparkle like the first. It, also, looked deeper than the first. **The two things I mentioned to [the store manager] had been changed!!**" (Dkt. 1 at 8 (emphasis in original).) She vacillated on whether to take the ring, but decided to do so because she "**feared that [her] entire set possibly could have been missing since the diamond had been boldly changed twice.**" (*Id.*(emphasis in original).)

Plaintiff states that her "request was for sizing <u>only</u> not anything else. No cleaning of the rings." (*Id.*) All parties agree that at no time did Plaintiff mention any dissatisfaction with the

color of the diamond to Defendant's employees.  (Dkt. 66 at 4, Ex. 5 at 9 (Harris Dep.).)  A police report filed by Plaintiff concerning the ring also omitted any mention of the color of the center diamond, describing the ring as a "diamond wedding set, with center diamond, two small diamonds and 3 rubies" and mentioning that it was a "fancy" diamond "2.35 carats" in size and valued at "$80,000."  (Dkt. 66 at 5, Ex. 11.)

Plaintiff indicates that a diamond of "[l]ight pink [and] top quality can command as much as $1 million per carat . . . [n]one of us at that time could fore vision nearly 30 years later natural color (fancy) diamond awareness would be where it is today.  These premium diamonds carry premium prices."  (*Id.*)  Plaintiff's appraiser concluded the replacement value of the ring was $2,000.  (Dkt. 61 at 3.)

Plaintiff sought the assistance of a private lawyer and the Attorney General but was unsuccessful in obtaining any help.  (Dkt. 1 at 9.)  Plaintiff's attempts to resolve this matter with Defendant or its parent company, Sterling Jewelers, Inc., were also unsuccessful.  (Dkt. 1 at 9-10.)  Therefore, Plaintiff filed the instant lawsuit alleging: (1) breach of trust/duty, and (2) embezzlement/larceny/conversion/damage to personal property/civil theft.  (Dkt. 1 at 10.)

## B.    Motion Standards

A motion for summary judgment will be granted under Rule 56(c) of the Federal Rules of Civil Procedure where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  All facts and inferences must be viewed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479

(6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In response, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the nonmoving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court will rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 404 (6th Cir. 1992). The Sixth Circuit has explicitly instructed that it is "utterly inappropriate for the court to abandon its position of neutrality in favor of a role equivalent to champion for the non-moving party: seeking out facts, developing legal theories, and finding ways to defeat the motion." *Id.* at 406.

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## C.    Analysis

I note at the outset that both of Plaintiff's claims rest on the allegation that the subject ring was altered by Defendant's alleged removal of a pink center diamond and replacement with a smaller non-colored diamond of lesser value.  (Dkt. 1 at 10.)

### 1.    Defendant's Argument and the Parties' Evidentiary Proffers

Defendant argues that even after a series of extensions on discovery time limits, Plaintiff "has <u>no</u> competent proof that her ring ever featured a pink diamond" and thus, she cannot withstand summary judgment.  (Dkt. 66 at 13.)  Defendant further notes that Plaintiff's own self-serving statements cannot serve to create a disputed issue of material fact sufficient to withstand summary judgement, nor can the affidavits provided by Plaintiff's affiants, which are based not on personal knowledge but rather on examination of photographs of Plaintiff's wedding taken in 1973.  (Dkt. 78 at 3.)  Finally, Defendant argues that the affidavit of Ms. Easley, a bridesmaid at Plaintiff's wedding, should not be allowed to support Plaintiff's response because Plaintiff did not identify Ms. Easley as a person who could testify to the presence of a pink stone in any of the many discovery requests for such persons.  (Dkt. 78 at 3-4.)  I note, however, that Ms. Easley was identified on Plaintiff's witness list.  (Dkt. 46 at 2.)

Plaintiff offers her own affidavit, the affidavits of Mr. and Mrs. Washington, and of Ms. Easley that the center diamond was pink.  (Dkt. 76, Exs. 4-5 (Washingtons), 6 (Easley), 9 (Plaintiff).)[4]  In addition, she offers a statement from a gemologist, Mr. DeMello.

### 2.    Lay and Expert Witness Testimony Standards

---

[4]As Defendant notes, Plaintiff also attached numerous grainy photographs of herself, including photos of herself as a baby, on her honeymoon, and several showing a ring on her hand, as well as other irrelevant documents.

Under Rule 701 of the Federal Rules of Civil Procedure, a lay witness's testimony is limited to "those opinions or inferences which are: (a) rationally based on the perception of the witness; (b) helpful . . ., and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. CIV. P. 701. Rule 702 provides that expert testimony must be based on "sufficient facts or data" and must be the "product of reliable principles and methods." FED. R. CIV. P. 702. The court serves as a gatekeeper, screening out purported experts whose methods are untrustworthy. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589-90, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

### 3. Plaintiff's Lay Witnesses

Although in many instances the color of an item could be rationally based on the perception of a witness without necessity of scientific, technical or specialized knowledge, I suggest that judging the color of a diamond is the type of specialized knowledge that can only come with some learned expertise. *See, e.g., New Olde Village Jewelers, Inc. v. Outlet Comm., Inc.*, 202 F.3d 269, 2000 WL 64942, at *5 (6th Cir. Jan. 14, 2000) (considering expert testimony that a diamond sold was of lower color and clarity than represented). Thus, I suggest that testimony regarding the color of Plaintiff's diamond should be limited to persons with at least some technical or specialized knowledge of the color grading system applied to diamonds. Since the Washingtons[5] and Ms. Easley fail to meet that mark, and since lay testimony is not appropriate regarding the color of the diamond, I suggest that their testimony cannot assist Plaintiff in responding to Defendant's summary judgment motion.

---

[5]Alternatively, Defendant argues that affidavits of the Washingtons should be disregarded because they are not based on personal knowledge. (Dkt. 78 at 3.) However, the Washingtons indicate that the ring was seen both in the wedding photographs and at their home. (Dkt. 76 at Exs. 4, 5.) Therefore, this recommendation is not based on that argument.

I further suggest that Plaintiff's own self-serving testimony is insufficient to withstand summary judgment. *See Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) ("conclusory statements are not sufficient to survive any motion for summary judgment"); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 584 (6th Cir. 1992) (conclusory statements are insufficient in summary judgment proceedings); *Lomax v. Sears, Roebuck & Co.*, 238 F.3d 422, 2000 WL 1888715, at *5 (6th Cir. Dec. 19, 2000) ("Such conclusory allegations, improbable inferences, and unsupported speculation are insufficient to defeat summary judgment."); *Shaw v. Danley*, 202 F.3d 270, 2000 WL 64945, at *7 (6th Cir. Jan. 10, 2000) (self-serving statement is not probative, but rather conclusory) (citing *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 962 (4th Cir. 1996) ("summary judgment affidavits cannot be conclusory" and "we generally consider self-serving opinions without objective corroboration not significantly probative")).

### 4. Application to the Parties' Expert Witnesses

Turning to the expert testimony, "an expert opinion must 'set forth facts' and in doing so, outline a line of reasoning arising from a logical foundation." *Brainard v. American Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005). Defendant offers the Declaration, given under penalty of perjury, of Martin D. Fuller, certified Graduate Gemologist with the Gemological Institute of America ("GIA"), Senior Member of the American Society of Appraisers ("ASA"), and certified Master Gemologist Appraiser. (Dkt. 66 at 5, Ex. 3, ¶¶ 1-2; *see also* Dkt. 67, detailed Report with color photographs supporting conclusions in declaration.) Mr. Fuller's governmental clients include the United States Federal Trade Commission, the United States Postal Service, the United States Customs Service and the Smithsonian Institution. His private clients include Tiffany & Co., Cartier, Bailey, Banks & Biddle, Starr & Frost, Neiman Marcus, Saks Fifth Avenue, Bloomingdale's and Macy's. (*Id.* ¶ 3.)

Mr. Fuller indicates that it is standard procedure to clean jewelry prior to performing any work on the jewelry and that such cleaning can dramatically change the physical appearance of the jewelry. (*Id.* ¶ 5.) Mr. Fuller further states that the "Starfire" line, which Plaintiff indicates her ring was a part of, "was comprised of simple, unassuming rings that were offered at a comparatively lower price than other rings . . . [and that the manufacturer] did not normally deal in fancy colored diamonds, and any ring featuring a colored diamond would have been a special, custom order [and] Plaintiff's ring was not a special order." (*Id.* ¶¶ 8-9.) Plaintiff has asserted that her ring is a "Carioca" ring, which was part of the Starfire line, and which carried a suggested retail price between $350 and $750; thus, Plaintiff's ring, purchased for $395, was at the lower end of that range. (*Id.* ¶¶ 10-12.)

Mr. Fuller asserts that the diamond currently in Plaintiff's ring is cut in a manner consistent with diamond cutting practices, techniques and styles used in the 1970s that are no longer employed, such as "frosted girdling" on a lathe with a second diamond held against the turning circumference versus the polished and faceted girdles used since the 1980s and the computer-driven cutting that is used today. (*Id.* ¶¶ 13-17.) In addition, Mr. Fuller notes that the "head" or "crown" of Plaintiff's ring, which is the series of prongs that constitute a "mounting," could not accommodate a 2.35 carat diamond whose 8.7 millimeter diameter is twice the diameter of Plaintiff's .29 carat diamond which measures 4.18 millimeters in diameter. (*Id.* ¶ 18.) Mr. Fuller also states that the head of a ring is fastened with a peg inserted through a hole in the top of the ring that is soldered into place and that a larger diamond would have required a larger peg and thus, a larger hole, but there is no evidence that Plaintiff's ring ever had a larger hole. (*Id.* ¶ 22.) Mr. Fuller further states that there is no evidence of damage to the white gold scrolling consistent

with removal and resoldering of the head, nor is there evidence that the rubies were removed, which would have been necessary if removing the head. (*Id.* ¶ 23.)

As noted earlier, there was no description on the sales receipt indicating that the center diamond was pink. Mr. Fuller states that a "2.35 carat natural fancy pink diamond would be a rarity to encounter in today's market and would have been a more uncommon item in the 1970s [and that] [f]ancy colored diamonds are valued according to the modifying colors, such as purple, brown, and orange and according to the intensity of the color, which would be noted as Fancy Light Pink, Fancy Pink, Fancy Intense Pink, Fancy Vivid Pink and Fancy Dark Pink." (*Id.* ¶ 26.) Mr. Fuller further explains that "[t]hese subtle differences in color can have a great impact on value, and would therefore have been reflected on the sale receipt." (*Id.*) For all the reasons he discussed in his declaration, Mr. Fuller opined that the "diamond presently mounted on plaintiff's ring is the diamond that was there when she purchased it." (*Id.* ¶ 27.)

I suggest that Mr. Fuller is a qualified expert, that his opinion is based on "sufficient facts or data," is the "product of reliable principles and methods," and clearly states a "line of reasoning arising from a logical foundation." FED. R. CIV. P. 702; *Brainard, supra.* I further suggest that his opinion provides sufficient support for Defendant's motion for summary judgment.

Plaintiff, on the other hand, offers the unverified statement of Arthur DeMello, Graduate Gemologist, GIA, who appraised her ring at $2,000 replacement value. (Dkt. 61 at 3.) Earlier in this case's lengthy discovery period, Plaintiff filed a "motion for conflict of interest" based on her concern that Mr. DeMello had a relationship with Defendant or Defendant's employees. (Dkt. 55.) The Court denied the motion because there was no relief requested. (Dkt. 59.) In addition, however, because Plaintiff's motion stated that she was "trying to locate another expert" and it contained a handwritten note that she would "try for Feb. 18, 2008, to give expert report" (Dkt. 55

at 2), the Court allowed Plaintiff an additional time period, until March 10, 2008, to either retain

a new expert or provide a written report from Mr. DeMello. (Dkt. 59 at 4.) Plaintiff filed a report

on March 10, 2008, which contained the unsworn statement attached to Plaintiff's response and

which also contained Mr. DeMello's credentials and clients. (Dkt. 61.) Therefore, although it is

difficult to discern whether Plaintiff is relying on or discrediting Mr. DeMello, for purposes of this

motion, I will assume she is relying on his testimony since it is the only objective evidence she

proffers.

In his statement, Mr. DeMello notes that:

> The prongs on Victoria's ring are much larger than what normal prongs would look
> like on a ring such as hers. These prongs resemble what is customarily referred to
> in the jewelry business as a (retip job) which is similar to a retread tire. Gold is
> added to prongs which are either missing or too small to hold a gemstone. These
> prongs also seem to have a slightly different color hue as compared to the remainder
> of gold contained in the ring giving the reasoning that the gold was added on.

(Dkt. 77 at Ex. 7; Dkt. 61 at 5.) Based on these observations, Mr. DeMello concluded that "I have

no past definitive information for comparison on this ring that proves to me the gemstones are

different, other than that the prongs had been re-tipped prior to my examination." (*Id.*)

Mr. DeMello's statement is unsworn, it is not provided under penalty of perjury, and it lacks

any indication that he is qualified to render such an opinion; thus, it could be considered

incompetent evidence for these reasons alone. *See Little v. BP Exploration & Oil Co.*, 265 F.3d

357, 363 n.3 (6th Cir. 2001) (court properly disregarded letter containing unsworn statements when

ruling on a summary judgment motion); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 191 (5th

Cir. 1991) (unsworn copy of transcript inadmissible as probative evidence and ineffective to defeat

summary judgment motion). However, in submitting the expert report, Plaintiff did supply Mr.

DeMello's qualifications, and Plaintiff could conceivably acquire a properly sworn and admissible

statement to the same effect. Thus, I turn to the substance of Mr. DeMello's statement.

First, Mr. DeMello's statement does not even purport to contain a reliable conclusion as to whether the center diamond is the original. He qualifies his statement by saying that he has "no past definitive information for comparison" and that he merely notes that "the prongs had been re-tipped prior to my examination." (Dkt. 77, Ex. 7; Dkt. 61 at 5.) Therefore, his "opinion" would not be helpful to a fact-finder because it is equivocal. In addition, his underlying facts undermine Plaintiff's contention and therefore cannot be used to support her response to Defendant's motion. Mr. DeMello observes that the "prongs on Victoria's ring are much larger than what normal prongs would look like on a ring such as hers . . . . Gold is added to prongs which are either missing or too small to hold a gemstone." (*Id.*) If probative at all, his statement supports the notion that the ring was altered to place a larger rather than a smaller stone in the setting. Plaintiff has not and likely would not complain about her ring being altered to add a more valuable, larger diamond. Thus, I find that to the extent his opinion could be helpful, it assists Defendant rather than Plaintiff.

### 5. Conclusion

I therefore suggest that Defendant has supported its motion with reliable evidence showing a lack of theft, conversion, or other alteration of the subject ring and that Plaintiff has failed to come forward with "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore, supra.* I thus suggest that Defendant's motion for summary judgment be granted and the case dismissed with prejudice in its entirety.

## III. <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596

(6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

 s/ Charles E. Binder

CHARLES E. BINDER
United States Magistrate Judge

Dated: August 21, 2008

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date, electronically served on John A. Decker, served on Victoria Harris, 3256 S. Auburn Drive, Saginaw, MI 48601-4504 via first class mail, and served on District Judge Ludington in the traditional manner.

Date: August 21, 2008        By     s/Patricia T. Morris
                             Law Clerk to Magistrate Judge Binder